<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ARELIS PIMENTEL, | Civil Action No. 15-2662 (JLL) |
| Plaintiff, | |
| v. | **OPINION** |
| CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

**LINARES**, District Judge.

This matter comes before the Court upon the appeal of Arelis Pimentel ("Plaintiff") from the final decision of the Commissioner upholding the final determination by Administrative Law Judge ("ALJ") Michal Lissek denying Plaintiff's application for disability insurance benefits ("DIBs") and supplemental security income ("SSI") under the Social Security Act (the "Act"). The Court resolves this matter on the parties' briefs pursuant to Local Civil Rule 9.l(f). The Court has reviewed the parties' submissions. For the following reasons, the Court affirms the ALJ's decision.

**I.    BACKGROUND[1]**

The Court writes for the parties who are familiar with the facts and procedural history of the case. The Court therefore specifically addresses in the discussion below only those facts relevant to the issues raised on appeal.

---

[1] "R." refers to the Administrative Record, which uses continuous pagination and can be found at ECF No. 5.

## II.   STANDARD OF REVIEW

A reviewing court will uphold the Commissioner's factual decisions if they are supported by "substantial evidence."  42 U.S.C. §§ 405(g), 1383(c)(3); *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000).  "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and "[i]t is less than a preponderance of the evidence but more than a mere scintilla."  *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).  Additionally, under the Act, disability must be established by objective medical evidence.  To this end, "[a]n individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section."  42 U.S.C. § 423(d)(5)(A).  Instead, a finding that one is disabled requires:

> [M]edical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all evidence required to be furnished under this paragraph . . . would lead to a conclusion that the individual is under a disability.

*Id*.; *see* 42 U.S.C. § 1382c(a)(3)(A).  Factors to consider in determining how to weigh evidence from medical sources include: (1) the examining relationship; (2) the treatment relationship, including the length, frequency, nature, and extent of the treatment; (3) the supportability of the opinion; (4) its consistency with the record as a whole; and (5) the specialization of the individual giving the opinion.  20 C.F.R. § 404.1527(c).

The "substantial evidence standard is a deferential standard of review."  *Jones*, 364 F.3d at 503.  The ALJ is required to "set forth the reasons for his decision" and not merely make conclusory unexplained findings.  *Burnett v. Comm'r of Soc. Sec,* 220 F.3d 112, 119 (3d Cir. 2000).  But, if the ALJ's decision is adequately explained and supported, the Court is not "empowered to

weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992).  It does not matter if this Court "acting *de novo* might have reached a different conclusion" than the Commissioner.  *Monsour Med. Ctr. V. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986)).  Finally, the Third Circuit has made clear that "*Burnett* does not require the ALJ to use particular language or adhere to a particular format in conducting his [or her] analysis.  Rather, the function of *Burnett* is to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review."  *Jones*, 364 F.3d at 505.

## III.    THE FIVE STEP PROCESS AND THE ALJ'S DECISION

A claimant's eligibility for benefits is governed by 42 U.S.C. § 1382.  Pursuant to the Act, a claimant is eligible for benefits if he meets the income and resource limitations of 42 U.S.C. §§ 1382(a)(1)(A)-(B) and demonstrates that he is disabled based on an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  A person is disabled only if his physical or mental impairment(s) are "of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

The Third Circuit has summarized "the five step sequential evaluation for determining whether a claimant is under a disability, as set forth in 20 C.F.R. § 404.1520" as follows:

> In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity.  20 C.F.R. § 404.1520(a).  If a claimant is found to be engaged in substantial activity, the disability claim will be denied. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

> In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment.  20 C.F.R. § 404.1520(c).  If the claimant fails to show that her impairments are "severe," she is ineligible for disability benefits.

In <u>step three</u>, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work. 20 C.F.R. § 404.1520(d). If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five.

Step four requires the ALJ to consider whether the claimant retains the residual functional capacity [("RFC")] to perform her past relevant work. 20 C.F.R. § 404.1520(d). The claimant bears the burden of demonstrating an inability to return to her past relevant work. *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir.1994).

If the claimant is unable to resume her former occupation, the evaluation moves to the final step. At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability. 20 C.F.R. § 404.1520(f). The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether she is capable of performing work and is not disabled.

*Jones*, 364 F.3d at 118-19 (formatting and emphasis added). "The claimant bears the burden of proof for steps one, two, and four of this test. The Commissioner bears the burden of proof for the last step." *Sykes*, 228 F.3d at 263 (citing *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5 (1987)). Neither party bears the burden of proof at step three. *Id.* at 263 n.2.

The ALJ engaged in the above five-step sequential evaluation and found: (Step 1) that Plaintiff "has not engaged in substantial gainful activity since January 1, 2008" (R. at 19); (Step 2) that Plaintiff "has the following severe impairments: degenerative disc disease of the spine and depressive and anxiety disorders" (*id.* at 20); (Step 3) that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments" (*id.*); (RFC) that Plaintiff has the RFC "to perform sedentary work . . . except that she can lift 10 pages occasionally, walk and stand a total of 2 hours and sit for 6 hours in an 8 hour day[,] . . . needs to stretch for 2 to 3 minutes in place per hour[,] . . . can never climb ladders, scaffolds, or crawl[,] . . . can bend and crouch occasionally[,] . . . is limited to work that can be

learned in 1 month or less and that involves simple instructions[,] . . . can have occasional contact with supervisors and minimal contact with the general public[,] . . . can work in proximity of coworkers but not together with them[, and] . . . is limited to work where the routine does not change throughout the day" (*id.* at 21); (Step 4) that Plaintiff "is unable to perform any past relevant work" (*id.* at 28); and (Step 5) that considering Plaintiff's "age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Plaintiff] can perform" (*id.* at 25). A vocational expert testified that Plaintiff "would be able to perform the requirements of representative occupations such as table worker . . ., small products final assembler . . ., ampoule sealer . . ., and patcher." (*Id.*) For these reasons, the ALJ found Plaintiff was not disabled. (*Id.*) Plaintiff appears to challenge the ALJ's reliance of Dr. Martin Fechner as a medical expert, and the decision at steps three and five as well as the RFC finding. (*See, e.g.*, Pl.'s Br. at 10-11, 22.)

## IV.   DISCUSSION

Prior to addressing Plaintiff's specific arguments, the Court notes that Plaintiff's brief fails to comply with Local Civil Rule 9.1. Plaintiffs' brief contains no meaningful statement of the issues for review, no statement of facts (separate from the procedural history), minimal citations to the record, and it does not contain an argument section that is "divided into sections separately treating each issue." L. Civ. R. 9.1(e)(5)(A)-(D). In fact, although Plaintiff accuses the ALJ of only using "the occasional out-of-context, cherry-picked entry," Plaintiff cites to five pages of medical records of the 694 page Record in support of her arguments. Although Plaintiff's arguments are therefore unclear and not meaningfully analyzed or supported, the Court, to avoid additional delay for re-briefing, and to not punish the Plaintiff for her counsel's errors, has addressed Plaintiff's arguments as best as it understands them.

### A.  Dr. Fechner

Plaintiff, represented by Abraham Alter, generally attacks the ALJ's decision for giving

weight to the opinion of Dr. Fechner, who was called as a medical expert.  Plaintiff argues:

> The instant case presents the same issues, the same non-explanations, the same
> rejections of evidence, the same labeling of restrictions and the same convenient
> RFC as is evident in virtually every ODAR denial. This one because ALJ Lissek is
> involved, also includes the same scandalous procedure which the Court refuses to
> remedy; that is, that this ALJ calls a specific medical expert and only that specific
> medical expert in 100% of the cases in which she uses a medical expert. This is not
> a secret, this is not disputed and the Commissioner, aware of this practice hasn't
> tried to stop it. Worse, not a single judicial eyebrow is raised when a retired internist
> is called uniformly to opine in areas of medicine for which he has no training or
> experience.

Pl.'s Br. at 10.  This is not the first time Mr. Alter has made such an argument.  At least as early

as 2005, Mr. Alter made virtually the same argument (albeit in reference to a different ALJ).  Mr.

Alter argued:

> In the face of this objectively proven and clinically correlated condition, the ALJ
> called his trusted team member, Dr. Martin Fechner, an internist who is called upon
> to testify in every medical advisor case regardless of the fact that he is not an expert
> on liver disease (or orthopedics, or psychiatry, or pulmonary disease) but yet is
> called upon in every medical advisor case by ALJ O'Leary.

*Orriols v. Comm'r of Soc. Sec.*, Civ. Case No. 04-5285, ECF No. 4 (Pl.'s Br. dated Nov. 16, 2005)

at 10 (Mr. Alter on the brief).  Mr. Alter's argument regarding Dr. Fechner was rejected by then

District Court Judge Greenaway.  *See id.*, ECF No. 8 (affirming the ALJ decision).  Thereafter, the

Third Circuit affirmed Judge Greenaway finding that

> [t]he ALJ credited Dr. Fechner's explanation because he was an impartial medical
> expert giving an opinion in his particular field of expertise. In relying on Dr.
> Fechner's testimony, the ALJ noted that Orriols's most recent blood tests were
> essentially normal, and Orriols suffered from mild liver disease. . . .
> * * *
> Orriols's arguments that the ALJ neglected to articulate the evidentiary weight
> accorded to facts, and to explain his reasoning for the residual functioning capacity
> determination, fail. The ALJ's opinion noted that non-examining physicians, like
> Dr. Fechner, are not normally given as much weight as a treating physician.

However, here, the ALJ accorded Dr. Fechner's opinion some weight because other facts in the record supported the doctor's assessment of mild liver disease. The ALJ continued to explain that Dr. Takla, Orriols's treating physician who is entitled to greater weight, never concluded that Orriols was disabled or completely unable to work. In this context, the ALJ met his obligations under *Cotter* to provide a clear and satisfactory explanation of the basis for his decision.

228 F. App'x 219, 224-25 (3d Cir. 2007).  In closing, the Third Circuit stated:

[W]e note with displeasure the conclusory and unprofessional assertions that pervade Orriols's brief. To accuse the ALJ of incompetence and partiality, among other failings, is most serious. In the context of this case, such conduct is offensive, reflects ill on counsel, and fails to serve his client. We trust that, in the future, counsel will recall our remarks here and act appropriately.

*Id.* at 225 n.4.  Alas, Mr. Alter did not heed the advice of the Third Circuit.  A few of the more

recent examples follow.  In 2012, this Court noted:

Plaintiff challenges the ALJ's decision to use Dr. Martin Fechner as a medical examiner for two reasons. First, Plaintiff asserts that Dr. Fechner was not qualified to testify about her lupus as he was a "fully retired internist who admitted that he was not a rheumatologist, had only a 'few' lupus patients in the history of his practice," and referred "anyone with 'serious' lupus" to a rheumatologist for treatment.  Second, Plaintiff alleges that Dr. Fechner maintains a close relationship with the Commissioner and has a bias towards the Commissioner.

*Jones v. Astrue*, 2012 WL 5451528, at *3 (D.N.J. Nov. 5, 2012) (citations to Mr. Alter's brief

omitted).  The Court rejected both arguments.  *Id.*   In 2014, Mr. Alter continued his attacks on Dr.

Fechner, arguing:

Finally, it must be said that the same invented biases conjured up by ALJ Krappa to eliminate any persuasive weight attributed to the treating physician are conspicuously absent in her endorsement of Dr. Fechner. Yet, the same yardstick might very well apply. Dr. Fechner has been retired since 2007. Dr. Fechner earns no professional medical income except for the monies he earns serving as the regular medical expert at ODAR hearings in Newark. Dr. Fechner has so testified, and that testimony is well known to the Commissioner. Dr. Fechner has also famously testified that HIV patients are universally referred to infectious disease specialists once a positive blood test confirms the virus.

*Blasucci v. Colvin*, Civil Action No. 13-5218, ECF No. 8 (Pl.'s Br. dated Apr. 24, 2014) at 16-17

(no citations were omitted, as is typical, Mr. Alter fails to provide support for such attacks).

District Judge Martini rejected this argument holding:

> Plaintiff also suggests that Dr. Fechner is unqualified to testify regarding Plaintiff's medical condition and thus the ALJ erred in adopting his opinion. Specifically, Plaintiff argues that Dr. Fechner is not qualified because he allegedly has admitted under oath that he does not treat HIV patients and instead refers them to infectious disease specialists. The Court is not persuaded by this argument.
>
> First, there is no indication from the record that Plaintiff objected to Dr. Fechner's qualifications at the hearing. Courts have previously refused to entertain arguments related to a medical expert's qualifications if a plaintiff failed to object to those qualifications at the hearing. Moreover, nothing on the record shows Dr. Fechner testifying that he refers HIV patients to infectious disease specialists, and the Court declines to base its decision on extra-record assertions.
>
> Even disregarding those points, the Court finds that the ALJ did not err by relying on Dr. Fechner's testimony. Consulting physicians for the Social Security Administration are deemed to be highly qualified experts in Social Security disability evaluation. Therefore, Dr. Fechner was qualified to evaluate Plaintiff's disabled status for the purpose of Social Security, which is exactly what he did. Additionally, the ALJ noted that Dr. Fechner is a board-certified specialist in internal medicine, which rendered him qualified to provide an opinion on Plaintiff's overall medical condition. The Court thus concludes that the ALJ did not err when it adopted Dr. Fechner's medical opinion.

*Blasucci v. Colvin*, 2014 WL 5286526, at *5 (D.N.J. Oct. 15, 2014) (internal citations omitted);

*see also Wilkinson v. Colvin*, 2014 WL 1316056, at *5 (Apr. 1, 2014) (Judge Salas rejecting Mr.

Alter's Dr. Fechner argument and finding that "Dr. Fechner is Qualified to Opine on Medical

Conditions Outside His Specialty").

As recent as last year, the Third Circuit (in a non-Alter case) found Dr. Fechner to be "an

impartial medical expert and board certified internist" on whom the "ALJ reasonably relied."

*Kerdman v. Comm'r of Soc. Sec.*, 607 F. App'x 141, 143-45 (3d Cir. 2015) (in a case where the

claimant "claims disability primarily based on physical impairments such as a disorder of the back,

exogenous obesity, asthma, gastrointestinal disorder, and mild bilateral carpal tunnel syndrome").

Thus, for approximately a decade, despite all the rulings to the contrary, Mr. Alter continues to put

forward general attacks on Dr. Fechner's credentials.   More troubling, he continues to do so through unsupported diatribes disparaging Dr. Fechner, the ALJ, the Commissioner, and the reviewing Courts rather than through thoughtful advocacy.   This Court will reiterate the words of the Third Circuit so many years ago.   Mr. Alter's approach is "offensive, reflects ill on counsel, and fails to serve his client."

In this case, like in *Blasucci,* Plaintiff's counsel before the ALJ did not object to Dr. Fechner testifying.   R. at 37-46.   In fact, Plaintiff failed to put before the ALJ any evidence or arguments that Dr. Fechner was not qualified to testify on the matters on which he offered opinions. *Id.*

Putting aside that Dr. Fechner's qualifications were not challenged before the ALJ, Plaintiff's arguments also distort Dr. Fechner's testimony, the ALJ's use of Dr. Fechner's opinion, and the content of the medical records.   For example, Plaintiff argues:

> This doctor doesn't treat orthopedic patients, doesn't read orthopedic MRIs but volunteers that:
>
> > Abutting just means touching. It doesn't mean very much. It's the radiologists way of saying, watch out something may be occurring (Tr.39).
>
> This impromptu nonsense is given "great weight" and thus a woman with disk disease at three cervical levels and at three lumbosacral levels with involvement of a nerve root is according to this internist, not only listing-proof but can easily sit six hours a day so long as she can stand and stretch for 2-3 minutes every hour. This is the basis of the ALJ's step three listing finding and her step four RFC finding.   The decision quotes Dr. Fechner as saying "the results of electromyography and nerve conduction studies show no evidence of radiculopathy (Tr.20). But they do:
>
> > Unobtainable H tibial response of the left tibial nerve could be related to left S1 radiculopathy. Clinical correlation is advised (Tr. 362).
>
> Not only do we have "clinical" correlation, we have MRI proof. That is exactly where plaintiff's L5-S1 herniated disk is abutting her S1 nerve root.

Pl.'s Br. at 13-14.  However, contrary to Plaintiff's selective quoting above of this medical record

of Plaintiff's electromyography test from 2009, it actually reads:

> Unobtainable H tibial response of the left tibial nerve *could be* related to left S1
> radiculopathy.    Clinical correlation is advised.    *Otherwise, there is no*
> *neurophysiologic evidence suggesting cervical or lumbosacral radiculopathy on*
> *either side.   There is no neurophysiologic evidence suggesting generalized*
> *neuropathy in the study.*

R. at 361-62 (emphasis added).  Dr. Fechner referenced this finding is his testimony (as did the

ALJ).  *Id.* at 38.  He also referenced in his testimony a lumbar MRI from April 2011 (referenced

by the ALJ as 8F, *id.* at 20).  *Id.*  The findings of that MRI were:

> On the neutral view, no fractures or listeses are seen. This does not change with
> flexion or extension. The disc spaces are preserved. The pedicles, spinous
> processes, and transverse processes are normal as are the SI joints.

*Id.* at 558.  The "Impression" from the test was: "Normal lumbosacral spine with no instability

seen."  *Id.*  Dr. Fechner also referenced a more recent "thoracic spine MRI [from] May 25, 2012"

and testified that "there was a question of a herniated disc on the left T7 to TB[, but] [i]t was only

seen on one of the images, and that's why they said it was questionable.  In any case, there was no

cord compression."  *Id.* at 38.  Dr. Fechner was referring to an MRI report of Plaintiff's thoracic

spine signed by Dr. Jeffrey Lang (referenced by the ALJ as 16F, *id.* at 20).  *See id.*  Dr. Lang's

report contained the following findings:

> Scans show questions of a left herniated disc at T7-8.  This appreciated on the
> sagittal images *but no corroborated on the axial images*.  The remaining disc spaces
> are preserved. *There is no thorasic cord compression*.
>
> There are no medullary bone lesions. The paraspinal soft tissues are unremarkable.
>
> The thoracic cord shows no atrophy, widening or syringomyelia. There is no
> abnormal cord signal. The cervicomedullary junction is normal. There are no
> extramedullary legions. The conus medullaris is unremarkable.

*Id.* at 631 (emphasis added).

The ALJ considered Dr. Fechner's testimony along with the above test results and subsequent records from a treating physician, Dr. Campoalegre.  *See id.* at 20, 22-23.  Dr. Campoalegre found:

> **Musculoskeletal**: Positive gait and station examination reveals midposition without abnormalities, good muscle tone, muscle strength 5/5/ in all muscle groups tested, peripheral pulses 2+ and equal. Negative pedal edema.
> **Spine**: **Tenderness**: Positive lumbar paravertebral muscles left, lumbar paravertebral muscles right, lumar spinous process.
> **Neurologic**: Positive Cranial nerves II through XII intact, NO signs of focal motor, sensory, or neurologic deficits, Oriented to time, place, and person.

*Id.* at 687 (emphasis in original); *see also id.* at 647, 650, 653-54, 690-91 (various 2013 examination records).   Thus, the ALJ did not merely rely on Dr. Fechner's "say so" as asserted by Plaintiff (*see* Pl.'s Br. at ___). ALJ Lissek analyzed the medical records and found them to be consistent with Dr. Fechner's opinion.

For all of these reasons, the Court finds Plaintiff's arguments regarding Dr. Fechner's qualifications and the ALJ's reliance on Dr. Fechner to be meritless.

**B.  Step Three**

1.  <u>Disc Disease</u>

Plaintiff argues that "[a]ll of this display of orthopedic ignorance [by Dr. Fechner] is designed to obfuscate the obvious, proven fact that plaintiff's herniated disk is sitting on (abutting) her S1 nerve root, a condition guaranteed to cause chronic pain in either the sitting or standing position."  Pl.'s Br. at 13.  Plaintiff further asserts that this testimony by Dr. Fechner "is offered specifically to circumvent paragraph 1.04A which affords a presumptive disability when there is 'evidence of nerve root compression.'"  *Id.*

Listing 1.04A provides:

Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture),

resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine) . . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1. *See, e.g.*, *Johnson v. Comm'r of Soc. Sec.*, 263 F. App'x 199, 202-03 (3d. Cir. 2008) (no evidence of motor loss to satisfy Listing 1.04A).

The ALJ found that "[w]hile it is clear that the claimant has significant disc disease of the spine, evidence indicates that her complaints of pain, which preclude all activity, are only partially credible." R. at 23. In support of this finding, the ALJ pointed to Dr. Fechner's testimony, and the tests and results noted in Section IV.A. above showing no nerve root compression. *See id.* at 20, 22-23. The ALJ also noted that "recent physical therapy notes indicate a pain level, which is 5 out of 10, and there is no evidence of any radiculopathy or neurological deficits. She ambulates normally without an assistive device." *Id.* at 23. Finally, the ALJ noted that, while her January 2008 through December 2010 self-employment as a caregiver of two toddlers did not qualify as "substantial gainful activity," "it does indicate that her spinal impairment may not be as debilitating as alleged." *Id.*

Plaintiff does not rebut the ALJ's analysis except for her attack on Dr. Fechner and the cherry-picked quote from the medical records. The ALJ found that Plaintiff's disc disease was a severe impairment, and found significant RFC limitations as a result, but an impairment, even if severe, does not mean that it meets a Step Three Listing. *See Jones*, 364 F.3d at 504 ("For a claimant to show his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify.") (quoting *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)) (emphasis in original). The

reason for this higher threshold is that "[t]he Secretary explicitly has set the medical criteria defining the listed impairments at a higher level of severity than the statutory standard" because the "listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing any gainful activity, not just 'substantial gainful activity.'" *Zebley*, 493 U.S. at 532 (emphasis in original) (quoting 20 C.F.R. § 416.925(a)).

The Court finds that substantial evidence in the Record supports the ALJ's conclusion with respect to Listing 1.04A.

### 2. Mental Impairments

With respect to the mental impairment listing finding by the ALJ, Plaintiff asserts:

> Turning to plaintiff's other severe impairments, "depressive and anxiety disorders" the Court will find the standard operating procedure. No criteria of either listing 12.04 or 12.06. One line eliminating the C criteria is offered and moderate restrictions in the B criteria distributed on the basis of little or no evidence. With this, the decision escapes step three poised for the "simple repetitive routine" tasks RFC. This well-known formula leads to hypothetical questions based on mental RFCs having little to do with the psychiatric evidence.

Pl.'s Br. at 15. Again, Plaintiff offers little, if any, meaningful analysis in support of these statements. Instead, Plaintiff relies again on a couple of incomplete, cherry-picked statements.

Listing 12.04 "Affective Disorders" is triggered when "the requirements in both A and B are satisfied, or when the requirements in C are satisfied." 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.04 (emphasis added). Listing 12.06 "Anxiety Related Disorders" is triggered when "the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied." *Id.*, 12.06 (emphasis added). The "B" criteria for both listings is the same. At least two of the following must be present:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration.

*Id.* The C criteria for Listing 12.04 requires a "[m]edically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

> 1. Repeated episodes of decompensation, each of extended duration; or
> 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
> 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

*Id.*, 12.04(C). The C criteria for Listing 12.06 requires a "complete inability to function independently outside the area of one's home." *Id.*, 12.06(C).

The ALJ found:

> In activities of daily living, the claimant has mild restriction. The claimant handles her own personal care but she testified that her husband helps with showers and tying her shoes due to pain. She does drive a car independently. She drove to the hearing. She drives her children to school. She testified that her husband and sister-in-law clean her apartment. She previously reported in June 2011 that she does light housework and food preparation (Exhibit 3E).
> In social functioning, the claimant has moderate difficulties. The claimant has reported that pain makes her irritable toward others (Exhibits 3E, 4E). Her treating source, University Behavioral Healthcare, reported symptoms of depression, low self-esteem, irritability and anxiety symptoms (Exhibit 7F).
> With regard to concentration, persistence or pace, the claimant has moderate difficulties. Treating source records dated May 5, 2011indicate impaired concentration and attention and distractible (Exhibit 7F, pg.5). Recent records dated May 30, 2013 indicate that memory is intact and attention and concentration is adequate (Exhibit 22F).
> As for episodes of decompensation, the claimant has experienced no episodes of decompensation, which have been of extended duration.

R. at 20-21. With respect to Plaintiff's mental impairments, the ALJ also noted:

> She has also reported that that pain and limitations have caused depression and anxiety and she has reported symptoms of crying, irritability and low self-esteem as well as anxiety symptoms including chest pressure, palpitations and sweating (Exhibits 7F, 15F). Both functional reports completed by the claimant and

her friend indicate that pain makes her irritable and moody toward others (Exhibits 3E, 4E). She testified that prescribed medication has stabilized her condition. Treatment records from University Behavioral Health care indicate that she has moderate symptoms (GAF-55) (Exhibits 7F, 15F) and there is no evidence of psychosis. In May 2011, initial evaluation indicated that concentration and attention were impaired, distractible (Exhibit 7F) but treatment records in May 2013 indicate that memory is intact and attention/concentration is adequate. It is reported that there are no side effects from psychotropic medication (Exhibit 22F). When examined by consultative psychologist, Dr. Fulford in August 2011 she reported non-command auditory hallucinations (Exhibit 13F) but treatment records do not mention any auditory hallucination and the claimant testified that she no longer has them.

Dr. Fulford diagnosed an adjustment disorder with depression features and he rated the claimant's global assessment of functioning (GAF) as 65 (Exhibit 13F) consistent with mild symptoms.

   The claimant's household limitations stem from her complaints of pain and not any mental limitations. She is independent in personal care except if she is in pain and she does drive a car independently.  She drives her children to and from work.  There is no evidence that she is unable to care for the children when her husband is at work.

*Id.* at 23-24.

   Despite the ALJ's thorough explanation and review and reference to Plaintiff's records, Plaintiff argues that the ALJ failed to properly account for the records of one of Plaintiff's treating physicians as well as a consultative examining psychologist, Dr. Paul Fulford.  Pl.'s Br. at 20. Contrary to Plaintiff's contention, the ALJ cited and expressly analyzed these records (*see supra*, referencing Exhibits 7F and 13F).  Unlike Plaintiff, the ALJ also included that Plaintiff's treating physician assigned a GAF score of 55—"Moderate Symptoms or Difficulty in Functioning"—in May 2011, and Dr. Fulford assigned a GAF score of 65 (mild symptoms) in August 2011.  The Court finds that the ALJ's analysis of Plaintiff's medical records, as well as her function reporting and daily activities, support the ALJ's B and C criteria findings.

   Although Plaintiff challenges the ALJ's decision for not addressing the A criteria (*see* Pl.'s Br. at 15), Plaintiff ignores that such an analysis is not required where—as here—the ALJ has found that both the B and C criteria were not met.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 (12.04

requires A and B or C, 12.06 requires A and B or A and C). The Court thus finds that substantial evidence supports the ALJ's decision with respect to the mental impairment listings.

### C.  RFC Finding

#### 1.  Required Breaks to Stretch

Plaintiff argues that "even under Dr. Fechner's non-expert opinion, given great weight in the decision, both the RFC and the VE questioning are based on physical capabilities that plaintiff does not have." (Pl.'s Br. at 15.)  Specifically, Plaintiff argues that she testified that "she could it a maximum of 20-30 minutes before needing stretch time," but that Dr. Fechner rejected such testimony and opined that she would need to stretch every "45 minutes to an hour."   (*Id.*)  Dr. Fechner's original opinion had required time to stretch every hour, with the above statement coming from testimony wherein he amended his opinion. *See id.*  Plaintiff argues that despite Dr. Fechner amending his opinion to require breaks every 45 minutes, the ALJ's RFC finding erroneously requires breaks only every hour. *See id*.

At the hearing, Dr. Fechner testified:

> Q       She testified she can sit for about 20 to 30 minutes maximum. At that point, she feels the need that she has to get up and stretch for a few minutes.
> Based upon her MRI studies, do you feel that would be, how do I put it, would that be a realistic - -
> A       Does it jive with the medical evidence? Is that what you want to know?
> Q       Yes, does it jive, thank you.
>
> A       Yes, it *could*. My feeling was that, I think I said an hour. I would probably amend that to 45 minutes to an hour she could sit, that general frame, and then would have to stretch. She's saying 20 minutes. You know, that's really --I don't know what to say here really. It's what she feels. I feel she can probably sit a little bit longer before needing to stretch.

R. at 44-45 (emphasis added).  After considering Dr. Fechner's testimony and the other evidence, the ALJ included a limitation requiring a break to stretch at the top of the range as amended by Dr. Fechner, one hour. *Id.* at 21.  Contrary to Plaintiff's statements in parts of the brief implying that

Dr. Fechner amended his opinion to require breaks every 45 minutes, such a characterization misstates Dr. Fechner's testimony.

An ALJ must consider all of the available evidence when evaluating the intensity and persistence of a claimant's symptoms, including objective medical evidence and a claimant's statements about his symptoms.  20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1); *see also Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999) ("This obviously requires the ALJ to determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it.").  However, an ALJ is not required to accept Plaintiff's testimony without question.  The ALJ has discretion to evaluate Plaintiff's credibility and render an independent judgment in light of the medical findings and other evidence regarding the extent of the alleged symptoms.  *Malloy v. Comm'r of Soc. Sec.,* 306 F. App'x. 761, 765 (3d Cir. 2009) ("Credibility determinations as to a claimant's testimony, regarding pain and other subjective complaints are for the ALJ to make.") (citing *Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983)).  The ALJ's decision emphasizes that while there was evidence of sever impediments and limitations, because of the records, Dr. Fechner's opinion, and Plaintiff's own reporting of her daily activities, including self-employed care of toddlers, the ALJ did not fully credit Plaintiff's subjective complaints and testimony regarding her limitations.  The Court finds that the Record supports the ALJ's decision.

Additionally, even if the ALJ erred and should have used the lower end of Dr. Fechner's opinion or the higher end of Plaintiff's own statements (breaks every 30 minutes), such error would be harmless.  The vocation expert testified:

> Q      Just going back to the first hypothetical question, if the claimant can only sit for 20 to 30 minutes at a time and then would have to get up and stretch for two to three minutes, would that change her opinion as to what jobs could be helped by her?

> A   Well, let's say that if the upper end, 30 minutes, stretch for two
> minutes, that may be a possibility. But if the individual is getting up every 20
> minutes and stretching two to three minutes, that would be a problem.

R. at 54.  The result would only be different upon fully crediting Plaintiff's own self-assessment

of her limitations, which the ALJ found to be an overestimate..  *See Shinseki v. Sanders*, 556 U.S.

396, 410 (2009) ("Often the circumstances of the case will make clear to the appellate judge that

the ruling, if erroneous, was harmful and nothing further need be said. But, if not, then the party

seeking reversal normally must explain why the erroneous ruling caused harm."); *Rutherford v.

Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005) (remand not required where "it would not affect the

outcome of the case").

### 2.  Adoption of Dr. Fechner's Opinion & Insufficient Analysis

With respect to the RFC limitations found by the ALJ based in part on Dr. Fechner's

opinions, Plaintiff states:

> These would seem strange limitations to a rational mind but for the fact that they
> seem to appear regularly in ODAR denials – each time without the slightest
> psychiatric basis or even reasonable lay-explanation for the peculiar working
> circumstances they envision. Of course, everyone knows that these are made up
> restrictions designed exclusively to formulate the hypothetical RFC guaranteed to
> produce VE jobs sufficient for the denial of benefits. But Courts hate to hear that.

Pl.'s Br. at 19.  Plaintiff further argues that "[s]omehow, psychotics, depressives, the panic-

stricken and the cognitively impaired are always capable of 'simple, repetitive, routine, low stress'

jobs of which there are presumably 20 million in our economy. But there is rarely evidence

supporting these RFCs."  *Id*. at 15.

With respect to the general attack on the RFC for reliance on Dr. Fechner's opinion, the

Court rejects such arguments for the reasons previously outlined.  Similarly, with respect to

arguments that the ALJ manufactured a mental RFC finding by ignoring treating physician and

consultant medical records, such arguments are based on cherry-picked statements, not a thoughtful rebuttal to the bases for the ALJ's conclusion.

### D.  Step Five

Plaintiff argues:

> Too often, an ALJ will contend that all of the plaintiff's mental limitations could somehow be nebulously accounted for by the caveat in the hypothetical question that the jobs in the national and local economy be "routine, low stress and low contact" (with the public, supervisors and co-workers). These types of hypothetical questions are virtually identical to the government's argument rejected by the Third Circuit in *Ramirez*.
>                          * * *
> It cannot be ignored that here the ALJ's vague construction limiting the plaintiff to "simple routine" or "one-two-step tasks" or "low contact work" does not come close to adequately conveying "moderate difficulty in maintaining social functioning" or other "moderate difficulties" in concentration, persistence, keeping pace, keeping a schedule, etc.  Here, just as in *Ramirez*, the VE's answers to the ALJ's questions may surely have been different had the actual, specific limitations, uncontradicted in the record, been conveyed verbatim as part of the ALJ's hypothetical.

Pl.'s Br. at 24-25 (citing *Ramirez v. Comm'r of Soc. Sec.*, 372 F.3d 546 (3d Cir. 2004)).  This argument appeared familiar to the Court.  And in fact it is—it is verbatim from another case recently decided by this Court, wherein Mr. Alter served as counsel.  In *Domkos v. Comm'r of Soc. Sec.*, Mr. Alter argued:

> Too often, an ALJ will contend that all of the plaintiff's mental limitations could somehow be nebulously accounted for by the caveat in the hypothetical question that the jobs in the national and local economy be "routine, low stress and low contact" (with the public, supervisors and co-workers). These types of hypothetical questions are virtually identical to the government's argument rejected by the Third Circuit in *Ramirez*.
>                          * * *
> It cannot be ignored that here [in the *Domkos* case] the ALJ's vague construction limiting the plaintiff to "simple routine" or "one-two-step tasks" or "low contact work" does not come close to adequately conveying "moderate difficulty in maintaining social functioning" or other "moderate difficulties" in concentration, persistence, keeping pace, keeping a schedule, etc. Here . . . the VE's answers to the ALJ's questions may surely have been different had the actual,

specific limitations, uncontradicted in the record, been conveyed verbatim as part of the ALJ's hypothetical.

Civil Case No. 15-2660, ECF No. 8 (Pl.'s Br.) at 28-29.  Accordingly, the Court responds as it did in that case to Plaintiff's broad, non-case specific argument.

A hypothetical question limiting the claimant to simple, routine tasks adequately accounts for moderate limitations in concentration, persistence, or pace. *See McDonald v. Comm'r of Soc. Sec.*, 293 F. App'x 941, 946 (3d Cir. 2008); *Menkes v. Astrue*, 262 F. App'x 410, 412-13 (3d Cir. 2008); *Torres v. Barnhart*, 139 F. App'x 411, 416-17 (3d Cir. 2005).) In *McDonald*, the Court held:

> [I]n line with her finding that McDonald only had "moderate limitations with his ability to maintain concentration, persistence and pace," the ALJ included in her hypothetical that the individual be limited to "simple, routine tasks" and that he avoid noise extremes and bright or sudden light changes. Because the hypothetical was adequate, the vocational expert's testimony regarding other work provided substantial evidence for the ALJ's conclusion.

293 F. App'x at 946-47; *see also Menkes*, 262 F. App'x at 412 ("[P]erforming a 'simple routine task' typically involves low stress level work that does not require maintaining sustained concentration."). The Court further held that—like here (where the ALJ determined "[w]ith regard to concentration, persistence or pace, [Plaintiff] has moderate difficulties")—the case was distinguishable from *Ramirez*, where we held that a hypothetical requiring that the individual's work be limited to "simple one to two step tasks" was inadequate because it did not take into account that the claimant "*often* suffered from deficiencies in concentration, persistence, or pace." *McDonald*, 293 F. App'x at 946 n.10 (citing 372 F.3d at 554) (emphasis in original).

Here, the vocational expert was asked to consider an individual

> limited to work that can be learned in one month or less and that involves simple instructions. She can have occasional contact with supervisors and minimal contact with the general public. She can work in proximity of coworkers, but not together with them. She is limited to work where the routine does not change throughout the

20

day.

R. at 51-52.  These limitations adequately reflect Plaintiff's limitations as found by the ALJ. The Court therefore finds Plaintiff's general *Ramirez* argument to be without merit.  To the extent that Plaintiff is arguing that the ALJ should have included greater limitations (including, for example, more periodic stretch breaks), that is an attack on the RFC itself, which was rejected by the Court above.

## V.     CONCLUSION

For the foregoing reasons, the Court affirms the ALJ's decision.  An appropriate Order follows this Opinion.

DATED:  June 21, 2016

   /s/ Jose L. Linares
JOSE L. LINARES
U.S.D.J.